## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————
SEAN KELLY and                          )
CATHRYN KELLY;                          )
                                        )
on behalf of themselves and             )
all others similarly situated,          )
                                        )
    Plaintiffs,     )
                                        )
                                        )
  v.                          )  Civil Action No.
                                        )
PETROLEX II, LLC, d/b/a                 )
CK SMITH SUPERIOR and                   )
JOHN C SANTORO, individually,           )
                                        )
    Defendants.     )
—————————————————————

## <u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>

1.  This is a class action brought on behalf of a group of Massachusetts consumers (pursuant to Fed. R. Civ. P. 23), who received heating fuel from the Defendants that contained more than five percent (5%) biodiesel, which was incompatible with their heating equipment and less efficient than industry-standard heating oil.

### <u>Parties</u>

2.  Plaintiffs Sean and Cathryn Kelly (the "Kellys" and/or "Plaintiffs") are individuals residing in Milford, Massachusetts. The Kellys have been customers of the business referring to itself as "CK Smith Superior" since approximately 2013.

3.  Defendant Petrolex II, LLC, d/b/a CK Smith Superior ("CK Smith") is a Massachusetts for-profit corporation with a principal office at 48 Providence Street, Millbury,

Massachusetts, 01527.  Per its website, CK Smith "delivers a B40 blend, where the fuel [the customer receives] is 40% biodiesel and 60% home heating oil."

4.      Defendant John C. Santoro ("John Santoro") is a Manager of CK Smith and, on information and belief, was a Manager of CK Smith at all relevant times.  On information and belief, John Santoro resides in Rhode Island.

## Jurisdiction and Venue

5.      This Court has personal jurisdiction over CK Smith, pursuant to G.L. c. 223A, § 2, because it is organized under the laws of Massachusetts and its principal office is located in Massachusetts.

6.      This Court has personal jurisdiction over John Santoro because he (a) transacts business in Massachusetts, having served as CK Smith's manager within the Commonwealth; and (b) caused tortious injury, as alleged herein, by acts and/or omissions occurring in Massachusetts.

7.      The citizenships of John Santoro, on the one hand, and Plaintiffs on the other, are diverse; the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs; and the number of members in the proposed class exceeds 100.  This Court therefore has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332 (d)(2).

8.      Lastly, venue is proper in this District because Plaintiffs and CK Smith reside in this District and most, if not all, of the facts giving rise to this Complaint took place in this District.

## Factual Allegations

**I.      CK Smith Contracted to Sell Named Plaintiffs Ordinary Heating Oil but Instead Delivered the Plaintiffs Thousands of Gallons of Fuel Containing Excessive Biodiesel, Causing Their Heating Systems to Shut Down**

9.      The Kellys were customers of CK Smith from approximately 2013 until the spring of 2023.

10. During that time, the Kellys have **only** ordered regular home heating oil (#2 Heating Oil) from CK Smith. The Kellys first ordered fuel from CK Smith over the phone by calling CK Smith's offices and requesting the delivery of regular home heating oil to their home in Milford, MA.

11. The Kellys' invoices, pay statements, and delivery tickets all described the product delivered to their home by CK Smith as "#2 Heating Oil" or "02-Heating Oil" until at least February 2023.

12. What's more, at all relevant times, when the Kellys logged onto their online CK Smith account, the delivery history unequivocally described the product delivered to their home as "#2 Heating Oil."[1]

13. Despite those representations, and upon information and belief, CK Smith has been delivering elevated levels of biodiesel to its customer base since at least March 2015. Indeed, upon information and belief, CK Smith was delivering blends of 20% biodiesel in March 2015 and steadily increased its blend level until it reached 40% at some point in 2022.

14. In early 2019, the Kellys contracted with CK Smith to install new heating equipment. On or about January 10, 2019, CK Smith technicians installed a brand-new Weil-McLain boiler in the Kellys' basement. CK Smith charged the Kellys $8,790.00 for the equipment, installation and removal of their old equipment.

15. Importantly, the Kellys' boiler came with two separate warranties. The first warrantied the "Heat Exchanger" for 20 years. The second warrantied "All Other Parts" for two years but only if No. 2 Fuel Oil was used in the system.

---

[1] On information and belief, the product descriptions in most, if not all, other customers' delivery histories are identical.

16.     The Kellys' other equipment (including their burner) was not rated for high biodiesel blends. Specifically, the Riello burner that was purchased by the Kellys (and installed by CK Smith) expressly provides that only No. 2 Fuel Oil should be used when operating the burner. Therefore, the use of the blends that CK Smith delivered voided the manufacturer warranties on the Kellys' burner (as well as other components).

17.     Fuel containing high blends of biodiesel is not rated for most burners or oil tanks by major burner and oil tank manufacturers. And, as discussed in more detail below, until very recently, ___**no burners were rated for high biodiesel blends**___ by most major burner and oil tank manufacturers.

18.     Given that their equipment was not rated for the high biodiesel blends CK Smith delivered it is unsurprising that the Kellys lost heat **_ten_** (**10!!**) **_times_** in only three years.  This, despite using CK Smith for regular maintenance[2].  In fact, at one point in 2022, the Kellys lost heat **_four_ _times_** in a little over a month (February 8, 2022 - March 15, 2022).  Each time they lost heat, the Kellys would call CK Smith, who would send out a technician to get the equipment back up and running.

19.     During one of these service calls, Plaintiff Sean Kelly asked one of CK Smith's technicians why he kept losing heat.  This technician told him that one of the other technicians had ___**mistakenly**___ "adjusted the air flow ___**back to factory settings**___" which caused their equipment to shut down.

20.     In other words, if the factory settings (which contemplate no more than 5% biodiesel) are applied when delivering high bio blends, the heating equipment shuts down, and in order to get the equipment back up and running with those elevated levels of biodiesel, the

---

[2] At all relevant times, the Kellys have had their heating equipment serviced by CK Smith technicians.

technicians need to go and "adjust" the equipment in a manner that is inconsistent with the manufacturer-approved settings.

21.    CK Smith never disclosed to the Kellys that their heating equipment was being adjusted in a manner that was inconsistent with manufacturer specifications in order to get the Kellys' equipment to burn CK Smith's biodiesel-laden fuel.

22.    On information and belief, each of the Kellys' heating equipment shutdowns detailed herein were caused by CK Smith's blending of biodiesel into their fuel.  Indeed, as noted above, CK Smith's technician confirmed that the Kellys' problems resulted from certain adjustments required to burn CK Smith's fuel. The sheer volume of calls without any significant mechanical issue is indicative of a fuel issue, moreover.

23.    In total, CK Smith has invoiced the Kellys more than $5,000.00 for deliveries of CK Smith's biodiesel-laden fuel since 2020[3] all while leaving the Kellys out in the cold during some of the most dire months of the New England winter.

II.    **CK Smith Was Delivering the Plaintiffs Fuel Consisting of Up to Forty Percent (40%) Biodiesel – *Not* Fuel Meeting Industry Standards for Heating Oil**

24.    On information and belief, ***all*** of the fuel CK Smith delivered the Plaintiffs and the putative class members since at least March of 2015 consisted of substantially greater than five percent (5%) biodiesel. Indeed, on information and belief, CK Smith was delivering fuel with at least twenty percent (20%) biodiesel to its entire customer base, starting in March 2015, before increasing it to 30% and eventually 40% at some point in 2022.

25.    According to the U.S. Energy Information Administration, heating oil (commonly referred to as "No. 2 fuel oil" or "ultra low sulfur diesel"), which CK Smith purported to be

---

[3] The Kellys only have access to their records through the online customer portal back to April 9, 2020.  But, on information and belief, they spent even more money on deliveries of CK Smith's biodiesel-laden fuel since at least 2015.

delivering, is fuel that meets standard D396 of ASTM International, which sets technical standards for the fuel industry globally.  (See U.S. Energy Information Administration, Glossary: Distillate fuel oil) (available at: https://www.eia.gov/tools/glossary/index.php?id=Distillate%20fuel%20oil, last visited December 11, 2023).

26.    The United States Department of Energy notes that fuel must be comprised of five percent (5%) or less biodiesel to "meet the ASTM D396 home heating oil specification."  (U.S. Department of Energy, National Renewable Energy Laboratory, Biodiesel Handling and Use Guide, 6th Ed., September 2023, at p. 2) (available at: https://afdc.energy.gov/files/u/publication/biodiesel_handling_use_guide.pdf, last visited December 11, 2023).

27.    Quite simply, none of the fuel CK Smith has been delivering the Plaintiffs was fuel that met industry standards for heating oil.

28.    Rather, on information and belief, every gallon of fuel CK Smith delivered to the Plaintiffs and the putative class since at least March of 2015 contained more than five percent (5%) biodiesel and, recently, as much as 40% biodiesel.

## III.    Fuel Containing Biodiesel Presents Risks for Traditional Oil Heating Equipment, Risks of Which Defendants Were Undoubtedly Aware

29.    The U.S. Department of Energy has found that bio-diesel freezes or gels at common winter temperatures of 27°F to 60°F  (Biodiesel Handling and Use Guide, supra, p. 6).  "As B100 begins to gel, the viscosity increases, quickly, which can increase stress on fuel pumps."  (Id.) "If the fuel begins to gel, it can [also] clog filters on dispensing equipment and may eventually become too thick to pump."  (Id. at p. 13).

30.    Ultimately, biodiesel's cold-flow characteristics "may make its use challenging in colder climates."  (Id. at p. 6).

31.     The U.S. Department of Energy has also noted that fuel consisting of higher percentages of biodiesel will act as a solvent and loosen or dissolve varnish and sediments in fuel tanks.  This can result in increased filter plugging.  (Biodiesel Handling and Use Guide, supra, at p. 6).

32.     Furthermore, fuel consisting of higher percentages of biodiesel may soften and degrade certain types of rubber compounds used for hoses and gaskets (such as those used in fuel pumps and other common components of heating equipment).  Using biodiesel in a "burner constructed with incompatible materials can … ruin a fuel pump or clog a filter as the hose material gradually erodes."  (Id. at p. 7).  The U.S. Department of Energy recommends biodiesel users, "[u]se extreme care to ensure any part of the fuel system that touches the fuel is compatible …." (Id. (emphasis in original)).

33.     Fuel consisting of higher percentages of biodiesel also corrodes yellow metals, including copper, which is used for most fuel lines and is commonly used in fittings and valves found in traditional heating systems.  (See id.)

34.     Peer reviewed literature published in scientific journals has concluded, moreover, that fuel consisting of higher percentages of biodiesel creates an additional risk of corrosion, leaking and failure for oil tanks.  (See, e.g., Leily Nurul Komariah, et. al., Microbial Contamination of Diesel-Biodiesel Blends in Storage Tank; an Analysis of Colony Morphology, Heliyon, Vol. 8 Issue 4, p. e09264 (April 022)) (available at: https://www.sciencedirect.com/science/article/pii/S2405844022005527, last visited December 11, 2023).

35.     Finally, unlike industry-standard heating oil, biodiesel poses a risk of spontaneous combustion.  Those risks were exacerbated for CK Smith's customers because they were not

warned of the spontaneous combustion risk and therefore did not know to handle biodiesel-soaked rags and absorbents carefully.

36.     Prior to September 2020, no burner manufacturer had approved (or warranted) their burners for use with fuel containing more than 5% biodiesel without a conversion kit.  Only certain Beckett burners manufactured after September 8, 2020, and certain Carlin burners manufactured after February 2021 are rated for up to B20.  In 2023, Beckett began manufacturing a burner that is rated for up to B100.

37.     As such, no CK Smith customers had the necessary equipment to burn fuel containing more than 5% biodiesel in their heating systems prior to at least September 2020.  And no CK Smith customers had the necessary equipment to burn fuel containing more than 20% biodiesel in their heating systems prior to at least 2023.  Even today, the vast majority of CK Smith customers (all but those few with brand new Beckett burners) do not have the necessary equipment to burn fuel containing more than 20% biodiesel.

38.     Nevertheless, upon information and belief, CK Smith has been blending at least 20% biodiesel into its fuel since at least March 2015.

39.     Likewise, the major North American residential oil tank manufacturers do not approve or warranty their tanks for use with fuel other than ordinary heating oil.

40.     Finally, ordinary fuel pumps are not rated for use with fuel containing higher than five percent (5%) biodiesel.  Rather, pumps specifically rated for biodiesel are required.  Again, on information and belief, many of CK Smith's customers do not have the necessary pumps to pump biodiesel blends through their heating system.

41.     In sum, fuel containing high biodiesel content presents significant risks of clogging the filters and/or nozzles of ordinary oil-burning furnaces, shutting down burners, seizing pumps, eroding oil tanks, voiding warranties and causing other harms.  Those risks are exacerbated in cold weather climates like New England.

42.     Heating oil blended with biodiesel is also less efficient than ordinary #2 heating oil and the blended fuel's efficiency decreases as biodiesel content increases.  Indeed, it is well-known within the scientific community that biodiesel has at least 10% less BTUs per gallon than industry-standard heating oil.  That, in turn, means that when fuel is 10% biodiesel, it is 1% less efficient than industry-standard heating oil, etc.

43.     Thus, it cost Plaintiffs more to heat their homes/businesses with CK Smith's fuel than with the industry-standard heating oil Plaintiffs ordered.

44.     In addition to the BTU decrease, CK Smith's fuel likely caused Plaintiffs' furnace to operate less efficiently due to its combustion properties.

45.     It is inconceivable that the Defendants were unaware of the foregoing risks and/or decreased efficiency of fuel blended with biodiesel.

46.     In fact, Defendants' internal e-mails demonstrate that Defendants CK Smith and John Santoro were both aware that fuel containing more than 20% biodiesel was a risk to clog filters and void customer warranties.

47.     Notably, Defendants were in a unique position to conceal the risks its fuels presented to customers.  Indeed, in addition to selling fuel, CK Smith provided maintenance services for oil-based heating equipment and offered service plans to perform that work – often for the same customers who use CK Smith's fuel delivery services.  CK Smith was, therefore, often the party fixing the clogs and furnace malfunctions the biodiesel-laden fuel had caused.

**IV.    Defendants Have Failed to Adequately Disclose the Biodiesel
Blends in Their Fuel and/or Provide Sufficient Warnings
Regarding the Risks of Using High Biodiesel Blends**

48.    Defendants have been deliberately concealing the foregoing risks and inefficiencies.

49.    In fact, Defendants appear to have been attempting to conceal that they were delivering biodiesel at all.  Among other things, on information and belief, since *at least* March 2015 Defendants have: (a) caused CK Smith's customers' online delivery histories to describe the product delivered as "#2 Heating Oil;" and (b) caused CK Smith's invoices and receipts to describe the product delivered as "#2 Heating Oil" or "02 – Heating Oil."

50.    At some point (on information and belief, in or around 2019), CK Smith began opaquely disclosing on CK Smith's pay statements that the delivery contains "a percentage of Biofuel ranging from  5% up to 30%," and even more opaquely disclosing on delivery tickets, "Up to 40% Bio Blend."  However, CK Smith only made said "disclosures" in fine print, buried at the bottom of the very same invoices and receipts that describe the product delivered as "#2 Heating Oil."  Making matters worse, the "up to 40% Bio Blend" "disclosure" on delivery tickets is often written in black print over CK Smith's dark blue logo, making it nearly impossible to read.  Even if customers can read the "disclosures" and happen to notice them, moreover, the information is so vague that it does not actually provide notice to a consumer of the product they are receiving – especially considering that the invoices/delivery tickets also describe the product as "#2 Heating Oil."

51.    CK Smith's web site also advertises that its "heating oil" is "Bioheat," which is a trademarked term used in the heating oil industry to describe "Blends ranging from 2% to 5%

biodiesel" (Clean Fuels Alliance, Bioheat®: What is Bioheat® Fuel?, available at: https://mybioheat.com/facts/what-is-bioheat-fuel/ (last visited December 11, 2023)).

52.     CK Smith's technicians have also been negligently adjusting the Kellys' (and the putative class's) heating equipment in violation of the manufacturer's specifications -- without telling them -- in order to get the Kellys' (and putative class members') system to surreptitiously run the high biodiesel blends.

53.     Moreover, CK Smith has not made adequate disclosures regarding its high biodiesel blends.  Indeed, CK Smith should have been disclosing, at a minimum, that its fuel: (a) contains fewer BTUs than ordinary (#2) heating oil; (b)  causes furnaces to operate less efficiently than ordinary (#2) heating oil; (c) is not intended to be stored in oil tanks in cold areas, such as outdoor oil tanks in New England; (d) is incompatible with most major manufacturers' burners and tanks and therefore voids customers' warranties; (e) is known to clog filters, nozzles, and fuel lines, causing heating equipment to shut down; (f) is known to degrade rubbers and yellow metals, such as those found in traditional heating equipment; (g) is known to cause oil tanks to leak prematurely; and (h) is a risk to spontaneously combust.

54.     To the contrary, as of the date hereof CK Smith's website *falsely* advertises that CK Smith's "Bioheat" Heating Oil "burns cleaner and more efficiently;" "can be used in conjunction with your existing equipment;" "cleans your heating system;" "extends equipment life;" "increases efficiency;" "lowers consumption" and "decreases internal tank corrosion."  (See, e.g., https://www.cksmithsuperior.com/pages/Bioheat.cfm (last visited December 11, 2023).

55.     Internal e-mails demonstrate that Defendants CK Smith and John Santoro both *knew* the fuel was a less valuable product, would void customer warranties and posed risks of clogging filters.

56.     On further information and belief, Defendants have earned significant sums in tax credits by selling biodiesel to its unwitting customers.  On information and belief, those tax credits were not passed on to CK Smith's customers.

57.     The Kellys would not have purchased fuel from CK Smith had they known it contained biodiesel in percentages that could damage their furnace and/or leave them without heat.

58.     The Kellys would not have agreed to pay heating oil prices for fuel containing biodiesel if they had known it was less efficient than traditional heating oil.

## V.     John Santoro Participated In and/or Controlled/Directed CK Smith's Scheme

59.     On information and belief, defendant John Santoro directed and controlled CK Smith's decision to sell fuel containing large quantities of biodiesel.  Indeed, CK Smith's internal e-mails demonstrate that John Santoro controlled and directed CK Smith's procurement of fuel to sell to customers.  In fact, these e-mails show that John Santoro made an agreement, with one of CK Smith's vendors, to acquire fuel with 20% biodiesel beginning in at least 2016.  CK Smith's e-mails demonstrate, moreover, that John Santoro was monitoring the biodiesel levels of the fuel the company delivered to customers.

60.     On further information and belief, defendant John Santoro, directed, controlled and/or substantially participated in CK Smith's decision not to disclose the risks of its biodiesel blends.  Indeed, CK Smith's internal emails demonstrate that John Santoro was personally aware that the fuel CK Smith delivered with elevated biodiesel levels: (a) caused service issues for CK Smith's customers, including clogged filters; and (b) possibly voided CK Smith's customers' equipment warranties.   John Santoro never caused CK Smith to disclose these risks to its customers, however.

12

## Class Allegations

61.     The Plaintiffs repeat and re-allege each and all of the allegations contained in the preceding Paragraphs.

62.     The Plaintiffs bring this action pursuant to Mass. R. Civ. P. 23 on behalf of themselves and a class of similarly situated customers who received fuel from CK Smith that contained more than five percent (5%) biodiesel, at any point since CK Smith began delivering fuel with more than 5% biodiesel (on information and belief, at least as far back as March 2015) (the "Class.").

63.     On information and belief, CK Smith represented to many (if not all) of its customers that it was selling #2 heating oil when CK Smith was actually delivering the Class fuel with more than five percent (5%) biodiesel. Indeed, as addressed above, CK Smith provides invoices and receipts that describe the product delivered as "#2 Heating Oil."  Likewise, class members' online purchase histories state that describe the product delivered as #2 Heating Oil.  On information and belief, CK Smith uses these same product descriptions uniformly for all (or the overwhelming majority) of its customers.

64.     Since at least March of 2015, however, CK Smith's default fuel (and the fuel CK Smith has sold to the overwhelming majority, if not all, of its customers) has contained at least 20% or more biodiesel; and, upon information and belief, the blend increased to 30% in 2021 and as of the fall of 2022 it increased its bio blend to 40%.  CK Smith has delivered this fuel to the vast majority of its customer base despite knowing it is incompatible with their heating systems and creates substantial risks of causing the customers to lose heat.

65.     As discussed in more detail above, at some point, CK Smith began including language on its invoices and/or receipts that states at the very bottom that delivery contains "a

percentage of Biofuel ranging from 5% up to 40%." CK Smith's delivery tickets state at the very bottom "(up to 40% Bio Blend)" with no other information. On many documents CK Smith prints this language over its logo, making it nearly impossible to notice. Even if visible, however, the language is too vague to be meaningful to an average consumer – particularly where the very same documents describe the product as "#2 heating oil." On information and belief, CK Smith provides this same language on all of its invoices and/or receipts to its entire customer base.

66.    Upon information and belief, CK Smith's technicians also surreptitiously adjust all (or the overwhelming majority of) customers' heating equipment in contravention of the manufacturers' specifications.

67.    Furthermore, CK Smith states -- to all of its customers and potential customers -- that its "heating oil" is "Bioheat." But, as of the date hereof and at all relevant times, the Clean Fuels Alliance (f/k/a National Biodiesel Board) stated on its website that "the industry is commonly referring to Bioheat as blends between 2% and 5% biodiesel," whereas "Bioheat® Super Plus," is used for blends of 20% to 100% biodiesel.

68.    Likewise, and most importantly, Defendants have not disclosed any of the risks or inefficiencies associated with heating fuel that contains more than five percent (5%) biodiesel to many (if not all) of CK Smith's customers. Indeed, as noted above, Defendants have failed to advise customers that its fuel: (a) contains less BTU content than ordinary (#2) heating Oil; (b) causes furnaces to operate less efficiently than ordinary (#2) heating oil; (c) is not intended to be stored in oil tanks in cold areas such as outdoor tanks in New England; (d) is incompatible with burners and tanks manufactured by most major burner and tank manufacturers and therefore voids customers' warranties; (e) is known to clog filters, nozzles, and fuel lines causing heating equipment to shut down; (f) is known to degrade rubbers and yellow metals, such as those found

in traditional heating equipment; (g) can cause oil tanks to leak prematurely; and/or (h) is a risk to spontaneously combust.

69.     CK Smith's fuel has caused harm to all of its customers' heating equipment. Indeed, CK Smith's fuel is incompatible with yellow metals and rubber materials found in heating equipment and caused degradation to those components beyond what would have occurred with ordinary heating oil.   CK Smith's fuel is also known to have properties that increase corrosion of oil tanks and caused corrosion to all of CK Smith's customers' oil tanks beyond what would have occurred with ordinary heating oil. And, as noted above, CK Smith's fuel voided warranties for all of its customers' burners and tanks that were still under warranty.

70.     Finally, Defendants have caused all of CK Smith's customers to receive a product worth less than the ordinary heating oil for which they paid.  Indeed, the fuel that CK Smith has been delivering from at least March 2015 until the present is worth little or nothing to CK Smith's customers because the fuel: (a) is less efficient at heating than ordinary heating oil; and (b) poses significant risk that it would shut down the customers' furnaces, leaving them without heat.

71.     The members of the Class are ascertainable from CK Smith's customer lists and delivery records.  In addition, CK Smith's records provide the following information, which can help assess Class' Members' damages: the amount of fuel each Class member purchased from CK Smith; the price of such fuel; details of service calls to Class Members' property (which, in turn, will show service calls caused by CK Smith's fuel); and the charges for any such service calls.

72.     On information and belief, the Class totals thousands of customers and it would be impractical to maintain separate actions.

73.     There are numerous common questions of law and fact among members of the Class, including: whether CK Smith's fuel was compatible with traditional heating equipment;

whether and when Defendants learned that CK Smith's fuel was incompatible with traditional heating equipment and/or that its use could harm customers' furnaces; whether there is a lower BTU count for CK Smith's fuel than normal home heating oil; whether a reasonable fuel vendor would have known that the biodiesel content CK Smith used in its fuel would damage furnaces; whether Defendants made false representations of fact and/or material omissions about their fuel in advertising and marketing materials, product descriptions, billing statements or otherwise; whether Defendants' conduct constituted a breach of contractual obligations and/or duties of care; and whether John Santoro is personally liable for CK Smith's negligence and fraud.

74.     The prosecution of separate actions against the Defendants under Massachusetts law would create a risk of inconsistent and varying judgments with respect to the Plaintiffs and the individual Class members and could establish incompatible standards of conduct for the Defendants.  In addition, adjudications with respect to individual members of the Class could as a practical matter be dispositive of interests of the other members of the Class not parties to such adjudications, or could substantially impede or impair their ability to protect their interests.

75.     Questions of law or fact common to the Class members predominate over any question affecting only individual members of the Class.

76.     The Plaintiffs' claims are typical of the claims of the Class because CK Smith delivered them all fuel that: (A) contained more than five percent (5%) biodiesel and therefore did not meet industry standards for heating oil, the product Plaintiffs and the Class ordered; (B) Defendants knew posed (undisclosed) risks to Plaintiffs and the Class's heating equipment; and (C) caused the Plaintiffs' heating equipment to shut down and experience excessive corrosion. The Plaintiffs' damages are typical of the Class's damages, moreover, because, like the other Class Members: (A) the Plaintiffs paid more for CK Smith's fuel than it was worth to a traditional

heating oil customer; and (B) the Plaintiffs' heating equipment was damaged in the same (or similar) ways as other Class Members' heating equipment was damaged.

77.     The Plaintiffs have retained counsel with a combined 30 years of experience in complex commercial litigation, including substantial experience with class action litigation in this Court.  With the advice of their retained counsel, the Plaintiffs will fairly and adequately represent the class.

<u>**Causes of Action**</u>
**Count I (Breach of Contract as to Defendant CK Smith)**

78.     The Plaintiffs and the Class repeat and re-allege here each and all of the allegations contained in the preceding Paragraphs.

79.     A valid, enforceable contract existed between the Kellys and CK Smith in which the Kellys agreed to purchase and CK Smith agreed to deliver standard heating oil (a/k/a #2 heating oil).  Indeed, the Kellys originally signed up to purchase standard heating oil and, at all times, the Kellys' Pay Statements, delivery tickets and their online customer portal stated that they were receiving "02 – Heating Oil" and/or "#2 Heating Oil."

80.     Likewise, a valid, enforceable contract existed between each Class Member and CK Smith in which each Class member agreed to purchase and CK Smith agreed to deliver standard heating oil (a/k//a #2 heating oil).  Indeed, on information and belief, all (or the overwhelming majority of) Class Members signed up to purchase standard heating oil and, at all times, the Class Members' Pay Statements, delivery tickets and online customer portals stated that they were receiving "02 – Heating Oil" and/or "#2 Heating Oil."

81.     The Kellys and, on information and belief, most (if not all) Class Members performed under their contracts by paying for all fuel deliveries from CK Smith.

82.     CK Smith breached its contract by delivering to the Kellys, and on information and belief, most (if not all) Class Members fuel containing more than five percent (5%) biodiesel rather than the standard heating oil CK Smith had agreed to deliver.

83.     CK Smith breached its contracts by delivering fuel with biodiesel content high enough to harm the Kellys' and the other Class Members' heating equipment.

84.     As a direct and proximate result of CK Smith's breach of contract, the Kellys and most (if not all) Class Members were damaged by receiving a product worth less than the standard heating oil they paid for.  Indeed, the fuel that the CK Smith delivered to the Plaintiffs and each of the Class Members was worth little or nothing because it is less efficient at heating than standard heating oil and because of the risk that it would shut down and corrode their heating equipment.

85.     Additionally, the Kellys and on information and belief, most (if not all) Class Members Class Members were damaged in other ways, including having to pay for repairs to their heating equipment, suffering undiagnosed damage to their heating equipment and/or incurring additional wear and tear on their heating equipment, suffering repeated losses of heat in the winter and having their heating equipment warranties void.

**Count II (Fraud As to All Defendants)**

86.     The Plaintiffs and the Class repeat and re-allege here each and all of the allegations contained in the preceding Paragraphs.

87.     CK Smith falsely represented that it was delivering standard heating oil when it printed "#2 Heating Oil" or "02 – Heating Oil" on statements, tickets and receipts CK Smith provided to the Plaintiffs and each of the Class Members.  On information and belief, John Santoro caused/directed CK Smith to make these misrepresentations and/or materially participated in CK Smith's misrepresentations and omissions.

88.     These false representations induced the Plaintiffs and each of the Class Members to purchase fuel from the Defendant.

89.     Plaintiffs and each of the Class Members reasonably relied on CK Smith's representations as to the contents of the fuel being delivered and signed up for, and continued to receive, fuel deliveries from CK Smith based on those representations.

90.     On information and belief, at the time CK Smith made its false representations Defendants CK Smith and John Santoro were both aware that CK Smith was not actually delivering standard #2 Heating Oil to the Plaintiffs or the other Class Members, but rather was delivering a fuel mixture containing more than five percent (5%) biodiesel.

91.     To this day, CK Smith has not corrected the misrepresentation (and John Santoro has not caused it to correct its misrepresentation) that CK Smith was selling standard #2 Heating Oil.  To the contrary, CK Smith (at the direction of and/or with participation from John Santoro) has continued to deliver receipts and invoices with each fuel delivery to Plaintiffs and the Class, which described its fuel as "#2 Heating Oil" or "02 – Heating Oil."

92.     On information and belief, moreover, most (if not all) of CK Smith's customers had no way of knowing the actual content of CK Smith's fuel (or that Defendants had misrepresented the same) as the statement that CK Smith was delivering biofuel blends of "up to 40% bio" was vague and meaningless.  To say nothing of the fact that Defendants buried this language at the bottom of the invoice and/or receipt.  What's more, the Defendants often printed CK Smith's company logo, which has dark blue lettering, over the black print language stating "Up to 40% Bio."  And, of course, this "disclosure" is contrary to describing the product as "#2 Heating Oil," as Defendants unequivocally described the product on invoices.

93. CK Smith also failed to disclose to Plaintiffs and each of the Class Members: (A) the known risks of using CK Smith's fuel in traditional oil-burning heating equipment and/or storing it cold-storage areas; and/or (B) the fuel's decreased efficiency. On information and belief, John Santoro caused/directed CK Smith to omit those material facts

94. On information and belief, moreover, most (if not all) of CK Smith's customers had no way of knowing these risks on their own.

95. On information and belief, Defendants CK Smith and John Santoro were each aware (or should have been aware): (A) of the risk that CK Smith's fuel could shut down its customers' furnaces and/or cause their heating systems long term damage; and (B) that CK Smith's fuel was less efficient than ordinary (#2) heating oil.

96. CK Smith's omissions were material to Plaintiffs and the Class Members. Indeed, none of the Plaintiffs and no reasonable consumer would have paid market heating oil prices for CK Smith's fuel if the risks and decreased efficiency had been disclosed. Representations as to the characteristics of a product are per se material moreover. Geanacopoulos v. Philip Morris USA, Inc., No. 98-6002-BLS1, 33 Mass. L. Rptr. 308, *14 (Mass. Super. Ct. Feb. 24, 2016) (Leibensperger, J.) ("'[c]ertain categories of information are presumptively material, including, but not limited to, express claims, claims significantly involving health or safety, and claims pertaining to the central characteristic of the product.'") (quoting In re Novartis Corp.. 127 F.T.C. 580, 566 (1999)).

97. As a direct and proximate result of Defendants' fraud, Plaintiffs and each of the Class Members were damaged by receiving a product worth less than the oil they paid for. Indeed, the fuel that CK Smith delivered to Plaintiffs and each of the Class Members was worth little or

nothing because it is less efficient at heating than standard heating oil and because of the risk that it would shut down their furnaces.

98.    Additionally, Plaintiffs and, on information and belief, many of the Class Members were damaged in other ways, including having to pay for repairs to their heating equipment, suffering undiagnosed damage to their heating equipment and/or incurring additional wear and tear on their heating equipment, suffering repeated losses of heat in the winter and having their heating equipment warranties void.

## Count III (Negligence As to All Defendants)

99.    The Plaintiffs and the Class repeat and re-allege each and all of the allegations contained in the preceding Paragraphs.

100.    CK Smith owed the Plaintiffs and the Class a duty to deliver heating oil that would efficiently heat their houses and businesses and not damage their furnaces.

101.    CK Smith also owed the Plaintiffs and the Class a duty to warn them about the known risks CK Smith's fuel posed to traditional heating equipment and/or when stored in cold storage locations.

102.    John Santoro, as an agent and officer of CK Smith, owed the Plaintiffs and the Class a duty to ensure that CK Smith: (a) delivered heating oil that would efficiently heat their houses and businesses and not damage their furnaces; and (b) disclosed the known risks CK Smith's fuel posed to traditional heating equipment.

103.    Defendants all knew or should have known that that biodiesel content in the fuel CK Smith delivered to Plaintiffs and the Class would not efficiently heat their houses and businesses, could harm their heating equipment and could clog and/or otherwise shut down.

104.    CK Smith breached its duties to Plaintiffs and the Class by: (A) delivering to the Plaintiffs and the Class fuel that contained a high enough biodiesel content to damage their furnaces; and (B) failing to disclose the risks the fuel posed to the Plaintiffs and Class' heating equipment.  Defendant John Santoro breached his duties to Plaintiffs and the Class by causing CK Smith to deliver such fuel and failing to ensure it disclosed the risks of its fuel to Plaintiffs and the Class.

105.    As a direct and proximate result of Defendants' negligence, Plaintiffs and, on information and belief, many of the Class Members were damaged by, among other things, having to pay for repairs to their heating equipment, suffering undiagnosed damage to their heating equipment and/or incurring additional wear and tear on their heating equipment, suffering repeated losses of heat in the winter and having their heating equipment warranties void.

106.    Additionally, Plaintiffs and each of the Class Members were damaged by receiving a product worth less than the standard heating oil they paid for.  Indeed, the fuel that CK Smith delivered to the Plaintiffs and each of the Class Members was worth little or nothing because it is less efficient at heating than standard heating oil and because of the risk that it would shut down their furnaces.

**Count IV**
**(John Santoro's Individual Liability)**

107.    The Plaintiffs and the Class repeat and re-allege each and all of the allegations contained in the preceding Paragraphs.

108.    It is well-settled that "A corporate officer is liable for torts in which he personally participated whether or not he was acting within the scope of his authority."  LaClair v. Silberline Mfg. Co., Inc., 379 Mass. 21, 28-29 (1979); see also Commonwealth v. Purdue Pharma, L.P., No. 1884-cv-01808, 2019 WL 5617817 (Mass. Super. Ct. Nov. 6, 2019) (Sanders,

J) ("a corporate director may be held personally liable for torts committed by the corporation if the director personally participated in the tort.")

109.    At all relevant times, Defendant John Santoro was a manager of CK Smith.

110.    As detailed above, CK Smith: (a) negligently delivered fuel to Plaintiffs and the Class that was not suitable for their heating equipment; and (b) materially misrepresented and failed to disclose the contents and characteristics of its fuel, in violation of its duty of care to the Plaintiffs and Class, as well as the common law prohibition on fraud.

111.    As detailed above, Defendant CK Smith's negligence, misrepresentations, and failures to disclose give rise to claims for negligence and fraud.

112.    As detailed above, Defendant John Santoro participated in and controlled/directed CK Smith's delivery of high biodiesel fuel incompatible with ordinary heating equipment, as well as CK Smith's material misrepresentations and failures to adequately disclose the risks of said fuel.

113.    Defendant John Santoro is therefore jointly and severally liable, along with CK Smith, for CK Smith's negligence and fraud.

**Prayers for Relief**

WHEREFORE, the Plaintiffs and the Class respectfully request that the Court:

A.      Issue an order allowing this action to proceed as a class action under Fed. R. Civ. P. 23;

B.      Enter judgment in favor of the Plaintiffs and the Class and against CK Smith on all counts and against John Santoro on Counts II-IV;

C.      Determine the damages sustained by the Plaintiffs and the Class and award such damages, as well as all interest as allowed by law;

D.      Award the Plaintiffs and the Class their costs and disbursements of this suit, including, without limitation, attorneys', accountants' and experts' fees and 12% statutory interest;

E.      Award the Plaintiffs and the Class pre-judgment and post-judgment interest on all amounts awarded at the highest rate allowable by law; and

F.      Award any other relief deemed just and appropriate by the Court.

### **PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

PLAINTIFFS SEAN AND CATHRYN KELLY;

On behalf of themselves and
all others similarly situated,

By their attorneys,


/s/ Jeffrey S. Strom
Jeffrey S. Strom (BBO #660992)
Law Office of Jeffrey S. Strom
P.O. Box 916
Boylston, MA  01505
(508) 925-5525
jeffrey@jeffreystromlaw.com

/s/ John Regan
John Regan BBO #684326
ERG, LLC
185 Devonshire Street, Ste. 200
Boston, MA 02110
T: (857) 277-0902
F. 857-233-5287
jregan@maemployeerights.com


Dated:  December 12, 2023